NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: https://www.courts.nh.gov/our-courts/supreme-court

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Housing Appeals Board
No. 2022-0182


APPEAL OF JAMES A. BEAL & a.
(New Hampshire Housing Appeals Board)

Argued: March 21, 2023
Opinion Issued: October 12, 2023

Duncan J. MacCallum, of Portsmouth, on the brief and orally, for the petitioners.


Sheehan Phinney Bass & Green, P.A., of Manchester (Michael D. Ramsdell and Brian J. Bouchard on the brief, and Brian J. Bouchard orally), for the respondent.


Trevor P. McCourt, of Portsmouth, for the City of Portsmouth, filed no brief.

HICKS, J. The petitioners, James A. Beal, Mary Beth Brady, Mark Brighton, Lenore Weiss Bronson, Nancy Brown, William R. Castle, Lawrence J. Cataldo, Ramona Charland, Lucinda Clarke, Fintan Connell, Marjorie P. Crean, Ilara Donarum, Joseph R. Famularo, Jr., Philippe Favet, Charlotte Gindele, Julia Gindele, Linda Griebsch, Catherine L. Harris, Roy W. Helsel, John E. Howard, Nancy B. Howard, Elizabeth Jefferson, Cate Jones, Robert McElwain, Mary Lou McElwain, Edward Rice, April Weeks, Michael Wierbonics, and Lili

Wierbonics, appeal an order of the Housing Appeals Board (HAB) reversing a decision of the Portsmouth Zoning Board of Adjustment (ZBA), which, in turn, had reversed certain approvals granted by the Portsmouth Planning Board (Planning Board) to the respondent, Iron Horse Properties, LLC (Iron Horse). We affirm.

The following facts either were stated in the HAB's order or relate the contents of documents in the certified record before us. Iron Horse owns real property located at 105 Bartlett Street in Portsmouth. In 2021, it requested various approvals from the Planning Board in connection with its proposed redevelopment of the site. Iron Horse proposed to construct three multi-family apartment buildings with a total of 152 dwelling units. The application to the Planning Board explained that the "site has [a] history of railroad and industrial use" and that remaining "derelict railroad structures . . . pose a safety hazard." It further stated that nearly the entirety of the 100-foot tidal wetland buffer had been previously disturbed and was "overgrown with invasive species," and that a portion of the site had "fallen into disrepair . . . [and] has long been an attractive nuisance with a history of debris, homeless encampments, and crime."

Iron Horse proposed to provide stormwater treatment, which currently does not exist at the site, and to remove invasive species from the 100-foot wetland buffer and replant with a majority of native plants. Portions of the proposed buildings would encroach on the wetland buffer, but the application stated that the project would constitute an "overall improvement" to the wetland buffer by moving buildings and parking further away from North Mill Pond than is the case in the site's current condition and by "reducing overall impervious surface." The application further observed that:

> The proposed development area has unique site conditions that include close proximity to the North Mill Pond; no build view corridors required by zoning that extend from perpendicular City streets located across the railroad; 15-foot side yard setback due to the adjacent railroad where none is typically required in the CD-4W district; and a 25-foot municipal sewer easement for a large sewer pipe that conveys wastewater flow for the City's west end to the Deer Street pump station. These unique conditions put constraints on the applicant's ability to locate buildings within the developable upland area.

Iron Horse sought a site review permit, lot line revision permit, conditional use permit (CUP) for shared parking, and a wetland CUP. The Planning Board granted the approvals on April 15, 2021, and the petitioners, who describe themselves as "a group of abutters and other concerned citizens," then filed an appeal with the ZBA, raising nine claims of error. The ZBA granted the appeal, effectively reversing the Planning Board's site plan and

2

CUP approvals.  Following denial of its motion for rehearing, Iron Horse then appealed the ZBA's decision to the HAB.  The HAB reversed the ZBA's findings as to six of the petitioners' claims and dismissed the remaining three claims.

The petitioners now appeal to this court, raising a number of issues that can generally be consolidated under the following overarching questions: (1) whether Iron Horse's proposed project met the six criteria for a wetland CUP set forth in section 10.1017.50 of the Portsmouth Zoning Ordinance; and (2) whether Iron Horse's permit requests were barred under the doctrine of Fisher v. City of Dover, 120 N.H. 187 (1980).

"Our review of the HAB's decision is governed by RSA chapter 541." Appeal of Town of Amherst, 175 N.H. 575, 577 (2023) (quotation omitted); see RSA 679:15 (Supp. 2022).  Accordingly, we will not set aside the HAB's order "except for errors of law, unless [we are] satisfied, by a clear preponderance of the evidence before [us], that such order is unjust or unreasonable."  RSA 541:13 (2021).

For its part, the HAB, in its review, must treat the factual findings of the "zoning board of adjustment or the local legislative body . . . [as] prima facie lawful and reasonable."  RSA 677:6 (2016); see also RSA 679:9, I (Supp. 2022). The HAB "shall not reverse or modify a decision except for errors of law or if the board is persuaded by the balance of probabilities, on the evidence before it, that said decision is unreasonable."  RSA 679:9, II (Supp. 2022).

We note that before the ZBA, the parties disputed whether the ZBA had jurisdiction over the petitioners' challenges to the issuance of the wetland and shared parking CUPs.  When the case reached the HAB, the parties continued to disagree about that issue, but nevertheless agreed that the HAB should hear the appeal of all claims, even those over which Iron Horse claimed the ZBA had lacked jurisdiction.  Accordingly, the HAB, which had jurisdiction over all issues in any event, did so.  See RSA 677:15, I-a (2016) (detailing procedures for appealing planning board decisions where some issues are appealable to the ZBA); RSA 679:9, I ("Appeals to the [HAB] shall be consistent with appeals to the superior court pursuant to RSA 677:4 through RSA 677:16.").  In their brief to this court, the petitioners now concede that "the ZBA had no jurisdiction to entertain th[e] part of their appeal" challenging the CUPs.  As the HAB had jurisdiction over all issues before it, the only consequence to the HAB appeal of this unusual procedural posture related to which party bore the burden of proof with respect to the CUPs.  Neither the petitioners nor Iron Horse contends that this procedural posture has any significance to the issues before us on appeal, and we agree that it does not.

The petitioners first contend that the HAB erred in upholding the Planning Board's issuance of the wetland CUP because, as a matter of law, Iron Horse's proposed project failed to meet the criteria for such a permit.  Although

the petitioners assert "[t]here is some doubt as to whether [Iron Horse's] proposal fully met any of the[] six criteria" in section 10.1017.50, they contend that it is unnecessary to consider four of the criteria because "it is beyond reasonable dispute that the plan failed to comply with subsections (2) and (5) of that section." Because the petitioners have not briefed the other four criteria, we deem any argument that those criteria are not met to be waived. See Girard v. Town of Plymouth, 172 N.H. 576, 591 (2019) (noting arguments not briefed are deemed waived).

Although the petitioners did not provide a copy of Portsmouth Zoning Ordinance section 10.1017.50, the parties agree that the applicable subsections of that section provide:

> (2) There is no alternative location outside the wetland buffer that is feasible and reasonable for the proposed use, activity or alteration.
> . . . .
> (5) The proposal is the alternative with the least adverse impact to areas and environments under the jurisdiction of this Section.

(Bolding omitted.)

With respect to criterion two, the petitioners assert that a diagram created by a professional engineer "showed irrefutably that it was and is feasible to erect three apartment buildings on the site at a location that is outside the 100' wetland buffer." The diagram appears to show smaller, truncated, and/or reconfigured versions of the three proposed apartment buildings superimposed on one of Iron Horse's plans. In that diagram, none of the buildings encroaches on the 100-foot wetland buffer.

Iron Horse argues that "[i]t is immaterial whether a different, smaller project could be developed on the property" and asserts that "[t]he operative question is whether a feasible alternative method is available to implement the project as proposed." It points to language in Malachy Glen Associates v. Town of Chichester, 155 N.H. 102 (2007), that it asserts supports its position. The petitioners, on the other hand, point to different language in Malachy Glen that they assert supports theirs.

We conclude, however, that Malachy Glen provides little guidance here, as it addressed an "other method reasonably feasible" analysis in the context of the now-superseded hardship standard for area variances that we adopted in Boccia v. City of Portsmouth, 151 N.H. 85 (2004), superseded by statute as stated in Harborside Associates v. Parade Residence Hotel, 162 N.H. 508, 513 (2011). Malachy Glen Assocs., 155 N.H. at 107; see RSA 674:33, I(b)(1) (Supp. 2022); Harborside Assocs., 162 N.H. at 513 (noting that the purpose of RSA

4

674:33, I(b), as indicated by the legislature's statement of intent, was to "eliminate the separate unnecessary hardship standard for area variances that we adopted in" Boccia (quotations omitted)).  The petitioners here do not challenge the issuance of a variance, but, rather, a CUP.  See 2 Patricia E. Salkin, American Law of Zoning § 14:1 (5th ed. 2019) (explaining that conditional use permits and variances differ "because while a variance authorizes a use that would otherwise be prohibited in the zoning district, a [conditional use] permit authorizes a use that is provisionally permitted, but subject to prior administrative review and approval").  The test for a variance under RSA 674:33 requires the applicant to show "unnecessary hardship," while none of the criteria for a wetland CUP under section 10.1017.50 requires such a showing.  RSA 674:33, I(a)(2)(E) (Supp. 2022) (providing, as one of the requirements for a variance, that "[l]iteral enforcement of the provisions of the ordinance would result in an unnecessary hardship"); see Salkin, supra § 14:1 (explaining that because "special uses are conditionally authorized under the zoning regulations, rather than ad hoc requests for zoning relief like variances, they are not generally required to meet the rigorous standards of undue hardship or practical difficulties").

Moreover, the inquiry at issue in Malachy Glen was different from that at issue here.  In Malachy Glen, the applicant was required to show, among other things, that "the benefit sought by the applicant cannot be achieved by some other method reasonably feasible for the applicant to pursue, other than an area variance."  Malachy Glen Assocs., 155 N.H. at 107 (emphases added).  Here, to satisfy criterion two in section 10.1017.50, Iron Horse was required to show that "[t]here is no alternative location outside the wetland buffer that is feasible and reasonable for the proposed use, activity or alteration." (Emphases added).

At the Planning Board meeting, board member Chellman questioned whether "there was buildable land on the parcel outside of the buffer[.]"  The senior project manager for the proposed project responded, referencing "the constraints . . . highlighted on the plan":

> There is upland out there but the view corridors, 25-foot sewer easement and railroad setback limit the options.  This project was located in the upland outside of the constraints.  If the buildings are pulled back, then they would be putting pavement in the buffer.  The entire project cannot be pulled back because of the sewer easement.

Nevertheless, Chellman asked whether the project could be "scaled back" to be outside of the buffer.  The petitioners contend that Iron Horse "never offered any explanation as to why this could not have been done, other than the fact that it would not have been as financially rewarding for them to do so." The petitioners assert that it was not until their appeal to the HAB that Iron

Horse "argued, for the first time, that it would have been <u>economically</u> infeasible for them to have erected their three buildings at a location outside the wetlands buffer," and that, therefore, the argument is waived. We disagree. In response to Chellman's question about scaling back the project, Iron Horse's attorney stated that doing so "would make the project no longer viable." When Chellman asked "if viability meant the economics of the project," the attorney confirmed that it did. Unlike the petitioners, we do not read this exchange to indicate that a scaled-back project would be less "financially rewarding." Viable is synonymous with feasible. See <u>New Oxford American Dictionary</u> 1925 (3d ed. 2010) (defining "viable," in relevant part, to mean "capable of working successfully; feasible"). Thus, Iron Horse argued economic infeasibility before the Planning Board.

We further note, with respect to the evaluation of criterion two, that the Planning Board's record contains plans for four previous versions of the project, with differently configured buildings on differing portions of the site. Having different iterations of the project before it gave the Planning Board a basis for evaluating whether there was a feasible and reasonable alternative location for the project on the site. Cf. <u>Tarullo v. Inland Wetlands and Watercourses</u>, 821 A.2d 734, 736, 741 (Conn. 2003) ("As a result of reviewing successive applications for the same site, the [inland wetlands and watercourses] commission can judge firsthand the feasibility and prudence of alternate development schemes."). Moreover, the Planning Board was entitled to credit Iron Horse's attorney's representation that scaling down the project to avoid encroachment on the wetland buffer would not be economically feasible. See <u>Dietz v. Town of Tuftonboro</u>, 171 N.H. 614, 624 (2019) (concluding that "it was not unreasonable for both the ZBA and the trial court to credit the representations made by [the equitable waiver applicant's] attorney that 'the cost would be prohibitive to remove the back of the [setback-encroaching] house'"). Accordingly, we find no error with respect to criterion two.

We reach a similar conclusion with respect to criterion five: whether "[t]he proposal is the alternative with the least adverse impact to areas and environments under the jurisdiction of this Section." Iron Horse's application summarized the buffer impacts of the "four prior . . . iterations of the Site Plan previously submitted to the Conservation Commission" as well as of the project as then proposed. The net figures ranged from a high of impacting 26,349 more square feet than the current site condition under the first iteration to a low of impacting 28,385 fewer square feet than the current site condition under the project as finally proposed and approved. This information gave the Planning Board a basis on which to conclude that the last-proposed iteration of the project was "the alternative with the least adverse impact to" the 100-foot wetland buffer. Accordingly, we find no error with respect to criterion five.

The petitioners nevertheless challenge the frameworks under which they claim: (1) the Planning Board considered and approved the wetland CUP; and

6

(2) the HAB reviewed that approval. They first note that the six criteria listed in section 10.1017.50 are mandatory and that Iron Horse was required to comply with all of them. They argue that the HAB concluded in its written decision that Iron Horse's "plan was 'not unreasonable' and used that conclusion as the main basis for its decision." They then assert the appropriate test is not "that a proposal is 'not unreasonable,'" but whether the six criteria are met.

Iron Horse counters that "[p]laced in the proper context of the entire HAB ruling," the language the petitioners challenge "reflects the burden of proof and is not a revision to the Wetlands CUP criteria." We agree. Although the HAB could have used more precise language, its decision as a whole reflects that it fully reviewed the record before it and ultimately "d[id] not believe that the Planning Board acted illegally or unreasonably in making its wetlands CUP decision." See RSA 679:9, II.

The petitioners further argue:

[A] majority of the members of the Planning Board treated [the six] mandatory criteria as mere "factors" and improperly adopted a "benefits vs. detriments" analysis, wrongly concluding that a wetlands conditional use permit may be issued if there is a "net" overall benefit to the environment after weighing the benefits of the proposal against its drawbacks.

We disagree. Much of the Planning Board members' discussion regarding the wetland CUP involved whether the applicable provisions of the zoning ordinance allowed building in the wetland buffer at all. Chairman Legg, however, noted that at a previous meeting, the city attorney "articulated the 6 requirements that are necessary to build within the 100-foot setback. If the City Attorney did not believe this could be built in the buffer, he would have said that." Chairman Legg further stated that the "[Planning] Board has always interpreted the ordinance such that the application is subject to the 6 criteria and appropriate mitigation when building in the buffer."

In its presentation to the Planning Board, Iron Horse's senior project manager went through each of the six criteria and argued that each was satisfied. During the board members' discussion, a non-member speaker who appears to have had some connection to the Conservation Commission[1] noted that that commission went "through the 6 criteria" and that the commission's members "are aware of the criteria and understand [them]." Admittedly, some members' remarks strayed into commentary about the overall benefits of the project as an improvement over the site's present condition, but we are not

---

[1] The record reflects that the Conservation Commission recommended approval of the wetland CUP with certain stipulations.

persuaded that the members failed to appreciate that all six criteria for a wetland CUP had to be satisfied.

In sum, we reject the petitioners' challenges to the frameworks under which the Planning Board and the HAB considered the wetland CUP. We conclude that the Planning Board had adequate evidence on which to determine that criteria two and five — the only two challenged on appeal — were satisfied, and its conclusion that they were satisfied was not unlawful or unreasonable. Accordingly, we conclude that the HAB did not err in finding that the Planning Board did not act illegally or unreasonably in granting the wetland CUP.

The petitioners next argue that the HAB improperly substituted its judgment for that of the ZBA. They argue:

> Applying this Court's holding in the familiar case of Fisher v. City of Dover, 120 N.H. 187 (1980), the ZBA found as fact that there was no substantial difference between the revised building plan and the one that had been rejected a year earlier. The [HAB] had no business setting aside this finding.

In Fisher, we held that "a zoning board, having rejected one variance application, may not review subsequent applications absent a 'material change of circumstances affecting the merits of the application.'" Brandt Dev. Co. of N.H. v. City of Somersworth, 162 N.H. 553, 556 (2011) (quoting Fisher, 120 N.H. at 191). Here, in connection with a previous iteration of the project, Iron Horse submitted an application in November 2019 for a variance to exceed the applicable height limitation. The minutes of the ZBA meeting at which the variance request was addressed reflect that Iron Horse sought a variance "to allow a portion of two buildings to be five-stories, 60 feet where a four-story, 50 foot building maximum is permitted." In this iteration of the project, 178 units were proposed. The ZBA denied the variance by unanimous vote.

The petitioners assert that the final iteration of the project, which the Planning Board approved, still "called for buildings exceeding the 50' height limit and reaching almost 60' in height." They explain:

> [Iron Horse's] solution to the dilemma created by the ZBA's previous denial of their variance request was simple: The new plan called for [Iron Horse] to transport fill into the site from outside and to pack it around the first story/ground floor garage of the[] new building. [It] would then call the first level "the underground garage" and would use the imported fill to raise by several feet the level of the ground surrounding it. [It] would then call the raised ground level "the new grade," from which the building's height was supposedly to be measured. By rearranging the numbers, [Iron

8

Horse] claimed that the[] new building would not violate the 50'
height limit and that therefore no variance was required.

(Footnote omitted.)  At the ZBA hearing, the petitioners called this alleged ruse
an "architectural sleight-of-hand."  The petitioners now assert that the "ZBA
was not fooled" and found "no substantial difference between the redesigned
buildings" and those for which it had denied a variance in 2020.

Iron Horse contends that the petitioners' Fisher doctrine argument is
factually incorrect because Iron Horse proposed bringing in fill to elevate the
grade in the 2019 variance application itself and not after that application was
denied.  In other words, as we read its argument, Iron Horse contends that no
"architectural sleight-of-hand" took place because the building heights in both
the 2019 variance application and the 2021 final plan were measured from
where the average grade would be after fill was brought in.  The record fully
supports this contention.

In its 2019 variance application, Iron Horse noted that in the project as
then proposed, it had graded the first floor of all three buildings "to raise the
elevation of all occupied levels of the building to provide additional flood
protection."  Moreover, when asked by a ZBA member whether "the building
heights would be measured from the railroad tracks area or the present
ground," Iron Horse's project engineer stated that "the first floor would be in
line with the railroad."  Thus, in asking for a variance for a sixty-foot tall
building, Iron Horse was not measuring height from the present ground level,
but, apparently, from the height of the regraded/elevated first floor.  In the
subsequent ZBA appeal from the Planning Board's decision, the project
engineer reaffirmed that "the elevation of the railroad track was 17 and the
finished floor was 17.5, so it was approximately the same elevation."

In the final iteration of its project before the Planning Board in 2021, Iron
Horse again measured building height from the elevated first floor.  As so
measured from the new average grade plane, none of the buildings exceeded
either four stories or, as the HAB noted, fifty feet in height.  Accordingly, the
record supports Iron Horse's contention that the petitioners' claim that it
"engaged in 'architectural sleight of hand' by raising the property grade after
the ZBA denied" its request for a variance is false.  Thus, even if the ZBA on
appeal did find, as the petitioners contend, "that at least with regard to the
height limit, there was no substantial difference between the plan which the
Planning Board had approved . . . and the one which the ZBA itself had
previously rejected" by denying a height variance, that finding is not supported
by the record.  Thus, the HAB appropriately could have disregarded it: "The
HAB's review is not whether it agrees with the [ZBA's] findings, but, rather,
whether there is evidence in the record upon which the [ZBA] could have

reasonably based its findings." Appeal of Chichester Commons, 175 N.H. 412, 415-16 (2022) (addressing HAB's review of a planning board decision).

The petitioners contend, however, that "there was conflicting testimony and other evidence as to whether [Iron Horse] artificially raised the ground level of their proposed new building in order to circumvent the ZBA's prior decision denying their application for a height variance, or whether they redesigned their building for legitimate reasons." They then assert that "[i]t was for the ZBA . . . to resolve conflicts in evidence and assess the credibility of the offers of proof." Harborside Assocs., 162 N.H. at 519. We are not persuaded. While the petitioners' attorney asserted before the ZBA that Iron Horse "engaged in architectural sleight-of-hand by bring[ing] in fill . . . to raise the ground an extra seven or eight feet," the minutes[2] do not reflect that they presented any evidence to that effect. On the other hand, as noted above, the record evidence as to the 2019 variance speaks for itself.

To the extent the minutes reflect a dispute before the ZBA in 2021 as to whether, under the applicable ordinance, building height should be measured from the higher regraded level or from the original ground level before fill was brought in, that dispute presented an issue of law, on which the ZBA did not explicitly rule[3] and which the HAB decided adversely to the petitioners. The petitioners have not appealed that legal determination by the HAB, and we therefore do not consider it.

For the foregoing reasons, we conclude that the HAB's order is neither legally erroneous nor unjust or unreasonable. See RSA 541:13.

Affirmed.

MACDONALD, C.J., and BASSETT and DONOVAN, JJ., concurred.

---

[2] The petitioners cite YouTube video recordings of the ZBA meeting, which they state are accessible from the City of Portsmouth's website. As such videos are not part of the certified record transferred to us, we have not viewed them.

[3] The HAB noted: "[T]he ZBA summarily reversed the Planning Board's decisions (Counts 1-9) without significant discussion. . . . In addition, [one ZBA member] said: '. . . the Board should just consider the totality of the appeal and say yes or no.' The [HAB] finds this method of deciding the numerous appeal counts to be suspect, since the focus of the ZBA was on the project itself and not each individual appeal request." (Citation omitted.)